**UNITED STATES of America**

v.

**Bohdan KOZIY, Defendant.**

No. 79–6640–Civ.–JCP.

United States District Court,
S. D. Florida.

March 29, 1982.

26

Michael Wolf, Kathleen Coleman, Jovi Tenev, Neal Sher, Dept. of Justice, Washington, D. C., for U. S.

Philip Carlton, Jr., Miami, Fla., for defendant.

## FINDINGS UNDER RULE 52

PAINE, District Judge.

The United States of America commenced the instant action on November 20, 1979 pursuant to the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. § 1451(a), to revoke the United States citizenship of Bohdan Koziy. The defendant was admitted to the United States for permanent residence on December 17, 1949 pursuant to the Displaced Persons Act of 1948. On February 9, 1956, the defendant became a United States citizen when the Supreme Court of New York, at Utica, New York, granted defendant's Petition for Nat-

uralization and issued him a Certificate of Naturalization.

These findings are made pursuant to Rule 52 of the Rules of Civil Procedure after trial of the issues in the cause by the court without a jury. Plaintiff, United States of America was represented by Michael Wolf, Esq., Kathleen Coleman, Esq., Jovi Tenev, Esq. and Neal Sher, Esq. and defendant, Bohdan Koziy was represented by Philip Carlton, Esq. in the trial held in West Palm Beach, Florida which commenced September 15, 1981 and was concluded October 2, 1981. The evidence submitted by the parties and argument of counsel provided by post trial memoranda were considered by the undersigned and resulted in the following findings.

## Findings of Fact

1. The region of Stanislau, currently known as Ivano-Franckovsk, was incorporated into the U.S.S.R. in 1939. Prior to that time Stanislau was part of Poland which was invaded by Germany in September 1939. Thereafter, Germany controlled western Poland while the U.S.S.R. controlled eastern Poland which was known as the Ukraine or Galicia.

2. From 1939 until 1941 the Jews who lived in German occupied Poland were moved to ghettos and their property was confiscated.

3. In the summer of 1941 Germany invaded the Soviet Union. For a short time the Ukrainians believed that they had been liberated from the U.S.S.R. and that the region would become a separate self-governed political entity. This expectation was shortlived since Nazi Germany soon installed its own civil and military administration.

4. At this time there were approximately 500,000 Jews in Galicia. The population of the city of Stanislau prior to World War II was about 50,000 people. Of this number approximately 50 percent were Jewish.

5. About 9 kilometers from the city of Stanislau was the small town of Lisets. In 1941 about 2,000 people inhabited Lisets. There were approximately 20 to 40 Jewish families there giving the town an estimated population of somewhere between 160 to 200 Jews.

6. By the middle of 1941 German policy changed from one requiring the emigration of all Jews to seeking their complete annihilation.[1] The latter was euphemistically referred to as the "final solution."

7. Plaintiff's exhibit 10 provided documentary evidence of this policy. This exhibit in German is known as the Oberfeldkommandantur 365, which is a monthly report for August 16 through September 15, 1942. It states that by December 31, 1942 all Jews of the Galicia District should be settled out. Professor Raul Hilberg testified that the words "murder," "killing," "genocide," etc. never appeared in German documents. Other words such as "final solution" or "resettled" were used in their place.

8. Plaintiff's exhibits four and five establish that the Germans utilized local citizens in the occupied territories to assist the German police units. Plaintiff's exhibit four is a letter attributed to Heinrich Himmler and dated July 25, 1941. In the letter it states that it is necessary that additional protection units be established expeditiously from the ethnic groups of the conquered territories. Included in the complement of these protection units would be Ukrainians. The letter goes on to indicate some of the logistical details of utilizing indigenous population as part of the security police.

9. Plaintiff's exhibit five is an order from Daluege dated November 6, 1942[2]. This document goes into some detail as to the composition of the various protective

---

1. Much of the historical evidence was presented by Dr. Raul Hilberg, an expert on the subject of the annihilation of European Jews. Dr. Hilberg is a professor in the Department of Political Science of the University of Vermont and the author of *The Destruction of the Euro-pean Jews.* He has participated in other denaturalization proceedings.

2. Daluege was in charge of the German Order police.

forces and manner of assigning individuals to these forces and the maintenance and compensation for those individuals within the forces. It is noted that this document includes a provision that the members of these self-contained units receive free health care within the scope of the health care provisions applicable for the Reich police.

10. In the German occupied areas a number of prohibitions and proscriptions were placed upon Jewish residents. For example, all Jewish residents were required to wear arm bands containing the Star of David. Further, their property was forfeited and when walking they were required to use the street as opposed to sidewalks. Such rules were enforced by the indigenous police who, in Galicia, were manned by Ukrainians.

11. Within two months of the German occupation of Poland the German efforts to exterminate the Jews were brought to Galicia. In August of 1941 Rabbis in the city of Stanislau were shot.

12. On October 12, 1941 an estimated 8,000 to 12,000 Jews were murdered on the outskirts of Stanislau by the Germans and their collaborators.

13. Ghettos for the containment of Jews were established in Galicia by the end of 1941. Efforts were made to transport Jews to the nearest ghetto.

14. In Stanislau a ghetto was formed approximately two weeks after the previously described October 12 action. The Jews were kept in the ghetto involuntarily. They were guarded by Jews inside the ghettos and outside by Germans and Ukrainian police. Food was rationed and only the minimal quantities were available. Many died of starvation and disease.

15. In addition to the killings carried out in Stanislau, the Germans also deported thousands of Jewish residents of the city to mass extermination camps. Belzec was the death camp nearest to Stanislau, being a few hours away by train. Approximately 500,000 people were executed there.

16. Between the fall of 1941 and spring of 1942 Jews who resided in the area surrounding Stanislau were brought to live in the ghetto. These included Jews who lived in the town of Lisets. In 1942 there were a number of actions in the Stanislau region which resulted in heavy Jewish casualties. According to Professor Hilberg's calculations in March of 1942, 2,000 were shot, in April, 3,000, in June, 1,000 and in August 2,500 were shot.

17. The Galician "deportation" was concluded by the spring of 1943. According to plaintiff's exhibit number eleven, the Katzmann report of June 30, 1943, 434,329 Jews had been "evacuated." The report also details confiscations of Jewish property which occurred over the previous few months. The Katzmann report, titled as the final report of solution of the Jewish question in the district of Galicia, details and specifies the horrors, atrocities and barbarism which was carried out by the Germans and their cohorts in their quest to exterminate the Jews in Galicia.[3]

18. The Stanislau ghetto was closed in June 1943. Thirteen months later the Soviets controlled the territory.

19. The Ukrainians were often friendly to the Germans as evidenced by plaintiff's Exhibit number nine which is the Oberfeldkommandantur 365 for 16 November through 15 December 1941. Thus the Germans were able to use their own as well as indigenous police to guard the ghettos. Indigenous police had most of the functions of the German police.

20. In Galicia Ukrainian police assisted in transportation of Jews from their homes to the ghettos. They also participated with German police in security sweeps and in roundups for taking the Jews to Belzec.

21. Ukrainian police made significant contributions to roundups. They made up 50 percent of the police complement in Galicia. While Ukrainian police may have independently killed five to twenty Jews at a time, they would not engage in large scale mass murder unless done so by German

3. In the Katzmann Report, according to Professor Hilberg, the words "special treatment" and "evacuation" are equivalent to the word "killing."

order.[4] In Stanislau Ukrainian police made arrests inside the ghetto. At times they were with Germans and at other times they were on their own.[5]

22. Recruits for indigenous police had to be anti-communist and physically fit. Ukrainian police served the Germans voluntarily.

23. The defendant was born on February 23, 1923 in the town of Pukasiwci which was located in the Stanislau region of Galicia. His given name was Bogdanus Kosij. He changed his name to Bohdan Koziy when he was naturalized as a United States citizen.

24. In the years 1936 through 1939 the defendant attended a Ukrainian private school located in Yavorew. He then attended trade school in Stanislau, starting in 1939. He took agriculture and tailoring courses for the next four to five months. The school was Russian controlled. Vacations were taken at Pukasiwci. He quit school in early 1940.

25. In 1939 the defendant began his participation in the Organization of Ukrainian Nationalists or OUN. He joined the Bandera faction which was named for its leader, Stephan Bandera. According to the defendant, the OUN succeeded the Ukrainian military organization or UWO. UWO members tended to be much older than the defendant's contemporaries.[6]

26. At the trial, defendant categorized himself as an OUN sympathizer, not as a member. However, he admits that he was involved. Other statements made by the defendant do not support his position that he was merely a sympathizer. For instance, his statement given to an INS interviewer on October 6, 1977 indicated that he was in the OUN organization, not that he was merely a sympathizer. In fact, he said he joined in 1939 and that the purpose of the movement was to fight the Russians. (Plaintiff's Exhibit 1–M). At the time the defendant was avowedly anti-communist. He testified that he never had any formal initiation. But he did use a pseudonym in connection with his OUN activities.

27. In August of 1941 the defendant's future father-in-law, Wasyl Ostapiak, became the Mayor of Lisets. He remained the Mayor of Lisets until December 1941 at which time he became the Mayor of the Lisets Commune under the German occupation.[7]

28. In the fall of 1941 the defendant returned to trade school in Stanislau. His attendance there appears to have been only as a cover for his resistance activities. Defendant admits to having been a courier for the OUN during the years of 1941 and 1942. He delivered messages in what were called sztafeta. He helped to supply the leader of the UPA with passports (Kennkarten), medication and supplies.

29. According to plaintiff's exhibit six, the Anmeldung, Mr. Koziy applied for social insurance on April 1, 1942 pursuant to his beginning employment as a Ukrainian policeman.[8] One of the witnesses, Jablonski, said that the defendant was one of five Ukrainian police stationed in Lisets. Mr. Jablonski testified that he had seen the defendant in a Ukrainian police uniform.

---

4. Yet one eye witness, Maria Frohlich, did not even see the Ukrainian police enforce the arm band regulation.

5. There were a number of police organizations in existence at the time. They were the Gestapo, the S. S., the Schutzpolizei which were made up of Ukrainians, Polish and Germans. The criminal police also made up of the same, the order police which were composed of Jewish people and the Bahnschutz police which was made up of Ukrainian, Polish and German people.

6. According to the witness Jablonski, the U.P.A. or Ukrainian Uprising Army was the same organization as the Banderowcy. U.P.A. cooperated with the Germans.

7. The Lisets commune included the town of Lisets and a number of neighboring communities.

8. Plaintiff presented the testimony of Antonio A. Cantu, Ph.D. who was a physicist and chemist with the Department of the Treasury. Dr. Cantu performed ink and paper analysis on plaintiff's exhibits 6 and 7. He concluded "in the examination I was not able to find any evidence which would suggest that these documents were prepared after their purported dates." Defendant presented no evidence to

The first time he saw him this way was in 1942 and thereafter saw him approximately once a week.[9]

30. In the summer of 1942 the Jews of Lisets were rounded up by the Ukrainian Police and forcibly relocated to the ghetto in Stanislau. Defendant participated in this round-up.

31. During 1942 the defendant was continuing some of his activities with the OUN.

32. The defendant's wife, Yaroslava Koziy the daughter of Wasyl Ostapiak, met the defendant in 1942 while he was still a student in Stanislau and attending a boys technical school.[10]

33. In January of 1943 Yaroslava took the defendant home to dinner in Lisets. At that time the defendant was living in Stanislau.

34. The defendant married Yaroslava June 19, 1943 in Lisets. The following day he and the Ostapiak family left for Stanislau and then on to Pukasiwci to have the traditional second wedding at the groom's house.

35. From August of 1943 to May of 1944 Mrs. Koziy only saw her husband sporadically. She resided during much of the balance of 1943 in Pukasiwci.[11]

36. In either January or February of 1944 Mrs. Koziy left Pukasiwci to go to Lisets to be with her mother when giving birth to her first child. She says that the last few weeks of her pregnancy took place during the German and Russian bombardment of Galicia. That first child was named Yarema and he was born April 28, 1944. The next month in May of 1944 Yaroslava returned to Pukasiwci to see her husband. It had been considerable time since she had last seen him.

37. Plaintiff's exhibit # 7, the Abmeldung, indicates that the defendant left the Ukrainian police on January 31, 1944.[12] At that time defendant accelerated his activities with the OUN which included military actions against Russian partisans in the Stanislau regions.

38. In the latter part of June 1944 Yaroslava and Bohdan Koziy and their son returned to Lisets.

39. In July 1944 defendant and his wife and child, along with most of the Ostapiak family, left the Ukraine and moved to Germany.

40. Defendant resided in the area of Heide, Germany, working as a farmer, until the surrender of Germany in 1945.

controvert Dr. Cantu or to challenge the authenticity of these documents.

9. According to the defendant in the summer of 1942 he met with a resistance member known to him as Marko but whose real name was Irodenko. These meetings took place in Lisets where Marko was a Ukrainian policeman and defendant obtained passports from Marko. Defendant categorically denied ever being a Ukrainian policeman. He admits having worn the Ukrainian police uniform once in either 1943 or 1944 as a disguise, but never in 1941 or 1942.

10. His wife said that he was not in the Ukrainian police at that time and she never saw him in a uniform.

11. According to the defendant he was wounded in the arm and left leg by machine guns during an OUN sponsored bombing raid on a train station. Defendant was treated in a small Ukrainian Partisan hospital. The witness Maria Kolodij testified that she saw Mr. Koziy at this hospital sometime between September and November 1943. Defendant asserts that since he was injured in the fall of 1943, he could not have been in the Ukrainian police at the same time as is posited by the government. The plaintiff attempted to show that this injury occurred in 1944 after the defendant completed his police employment.

The Court finds it unnecessary to reconcile this factual conflict in the sequence of events. That the defendant may have incurred a temporary disabling injury in the fall of 1943 does not preclude a finding that he had been a Ukrainian policeman and may have continued to be so employed for a few more months.

12. Wasyl Ostapiak testified that he would have objected to his daughter marrying a Ukrainian policeman. It is interesting to note that Mrs. Koziy moved back to Lisets from Pukasiwci at this time. This prior physical separation may be one reason that the defendant's wife never saw him in a police uniform. While the possible dynamics between family pressures and the defendant's employment make for interesting speculation, there is not enough evidence in this regard to permit a finding of fact.

41. After the surrender of Germany, defendant and his family became residents of several displaced persons camps operated in Germany by the International Refugee Organization, an agency of the United Nations.

42. Evidence concerning seven witnesses' photographic identifications of Mr. Koziy support the finding that the defendant was a Ukrainian policeman. This evidence was presented by video-taped depositions that were taken in Poland and the U.S.S.R.[13]

13. A number of the witnesses who were deposed in either Poland or the U.S.S.R. were presented with photo spreads containing eight pictures. This presentation was made by an investigator some time before the actual taking of the depositions. At the time of the deposition the witnesses recited the manner in which the photo spread identification was undertaken and indicated which picture, if any, they identified as either the defendant Bohdan Koziy or his wife Yaroslava.

Witness Josif Waclaw Jablonski selected photographs E and G of plaintiff's exhibit 22–A2. These photographs represented his best recollection of what Bohdan Koziy looked like when he knew him. Mr. Jablonski selected photograph D of plaintiff's exhibit 22–A3 as representing someone who reminded him of Yaroslava Koziy. Mr. Jablonski had testified that Bohdan Koziy was a Ukrainian policeman and that he had seen Bohdan Koziy commit two murders in the fall of 1943.

Yosif Frankovich Il'kovs'kii testified that Bohdan Koziy was the Ukrainian police Chief's assistant. He had seen the defendant wearing a uniform and carrying weapons. Photograph 6 of plaintiff's exhibit 22–F was selected by Mr. Il'kovs'kii as that person he remembered to be Bohdan Koziy.

Anna Frankivna Snigur became thirteen years old in May 1943. She testified that Bohdan Koziy was a Ukrainian policeman. The witness selected photograph 6 of plaintiff's exhibit 22–D. Plaintiff's counsel conceded at the time of trial that the incorrect picture was identified by this witness. It should be noted that the witness said that the photograph was not Koziy's face but showed his hair as she remembered it.

Maria Antoniva Il'kovs'ka testified that the defendant was a Ukrainian policeman in Lisets. She said that she saw the defendant taking Jews to the ghetto. This witness selected photograph 7 of plaintiff's exhibit 22–G1 as that photograph that looked like Yaraslava Ostapiak. When presented with the photographs in plaintiff's exhibit 22–G2, Mrs. Il'kovs'ka selected photograph number 6 as being a photograph of Mr. Koziy when he was young.

Anton Micheylovich Vatseb chose photograph number 2 of plaintiff's exhibits 22–E1 as being someone from the Ostapiak family. He also said that photograph number 2 of plaintiff's exhibit 22–E2 looked like Koziy. Mr. Vatseb links the defendant to acts of murder.

Jadwiga Spilarewicz, who had testified that Ostapiak's daughter had married a policeman, identified photograph D of plaintiff's exhibit number 22–B as being that same person.

Karol Koluszko when presented with eight male photographs selected two photographs which reminded him of Bohdan Koziy. These were photographs E and G of plaintiff's exhibit 22–C1. This witness chose photograph D of plaintiff's exhibit C–2 as being a photograph that reminded him of Yaraslava Ostapiak's sister. Mr. Koluszko said that he knew the defendant to be a Ukrainian policeman married to the Mayor's daughter. He said that he saw Bohdan Koziy arrest the witnesses' uncle and grandfather. He also saw defendant at the wedding reception by looking through the window from the outside of Wasyl Ostapiak's house.

The photographs selected by Il'kovs'ka, Il'kovs'kii and Vatseb to be of the defendant are identical to the photograph in plaintiff's exhibit 1–G. This photograph is attached to Bohdan Koziy's "Declaration of Intention" and is part of the defendant's immigration file. Photograph E of exhibit 22–A2 selected by Jablonski and photograph E of exhibit 22–C1 selected by Koluszko are also the same as the photograph in exhibit 1–G. The second photographs selected by Jablonski and Koluskos were of the same person.

As to the photographs of the females, the witnesses selected the same photograph. These photographs appear to be of the same person as the photo in plaintiffs exhibit 2–A, which is Yaroslava Koziy's "Application for Immigration Visa and Alien Registration."

These photographic identifications were reliable when considering all the circumstances. The witnesses had ample opportunity to view the defendant and they were also accompanying physical descriptions which favorably buttress the identifications. There was no evidence presented that the photographic spreads were either impermissibly suggestive or in some other way tainted the witnesses' ability to objectively select those photographs which best portrayed their recollection of Bohdan Koziy.

The defendant elected to waive his right to be present at the overseas depositions and was unable to cross-examine these witnesses. Thus the defendant was limited in his ability to challenge the identification evidence. Nonetheless,

43. The defendant personally and single-handedly murdered the female child of Dr. Singer. During or after most of the Jews of Lisets were placed in the Stanislau ghetto, this child was sent to live with friends who were Poles. She eventually was given to a gentile Polish woman by the name of Jadwiga Spilarewicz. In the fall of 1943 Spilarewicz was warned that a Polish family in the area had been arrested for hiding Jews. She decided to move to Cracow but stopped in Lisets to obtain money from a relative for the trip. While staying in her aunt's house, the child was apparently discovered. Two Ukrainian policemen came to the house. One of the policemen (tall and slim) accused Spilarewicz of hiding a Jewish child; she denied it. Upon protesting that the child was Polish, rather than Jewish, Spilarewicz was struck by that same policeman. After the police ransacked the house and took money, they brought Spilarewicz and the child to the police station in Lisets. Spilarewicz was placed in a holding cell at the station and the child was taken from her. Spilarewicz did not observe what happened to the child. Subsequently, Spilarewicz was taken to the jail in Stanislau where she was kept for several weeks before being released.

Other residents of the village who had heard of the arrest were present at the police station when Spilarewicz and the child were taken into custody. Josef Jablonski, Anton Vatseb and Ganna Snigur were standing at different points behind the police station watching the events as they unfolded. They each observed a Ukrainian policeman drag the child outside to the courtyard behind the police station. As the child was pleading to be spared, the policeman shot and killed her at point blank range. Both Jablonski and Maria Il'kov'ska later saw the girl's body at the Jewish cemetery, along with the bodies of other Jews (e.g., the Kandlers) who had been killed at about the same time.

Snigur, Jablonski and Vatseb all testified that the policeman who murdered the girl was Bohdan Koziy. They all identified Koziy as having been tall, slim, fair-haired and young. They all remembered him as the mayor's son-in-law.

Both Jablonski and Vatseb were standing in positions outside the courtyard of the police station which allowed them ample opportunity to observe the Singer murder.

44. The defendant actively participated in the murder of members of a Jewish family named Kandler in the fall of 1943, particularly one Bernard Kandler.

45. Plaintiff's exhibit 1–C is an application for Immigration Visa and Alien Registration. It indicates that the applicant is Bogdanus (Bohdan) Kozij and within the application is a photograph of the applicant and his signature. The Court finds that the signature on the photograph is that of the defendant Bohdan Koziy.

46. Prior to October 27, 1949, defendant applied to the International Refugee Organization for certification as a refugee and displaced person within the meaning of the Constitution of that Organization. That certification was granted.[14]

the consistency of the identifications and physical descriptions are strongly indicative of the accuracy of this evidence.

14. The plaintiff had as witnesses a number of persons who were directly involved in the processing of refugees under the International Refugee Organization and the Displaced Persons Commission. Michael Thomas, who as of July 1, 1947 had two years with the United Nations Relief and Rehabilitation Agency worked with the preparatory commission of the IRO. He was the Chief of eligibility in the British zone of Germany and was in charge of field eligibility officers. In August of 1948 he became Chief Eligibility Officer and remained in that position until August of 1950. Mr. Thomas testified that Annex 1 of Article 2a of the IRO Constitution prohibits people who served as police during the German occupation to be eligible for IRO assistance. He also testified that one who voluntarily travels from his home country to Nazi Germany would not be a displaced person and thus would not be eligible for IRO assistance. All applicants were required to have the IRO interview them and to determine their eligibility for United States Displaced Person Commission. Only those who were IRO eligible qualify under the Displaced Person Act for United States Visa.

47. The Displaced Persons Commission was an agency of the United States charged with the responsibility of processing visa applicants under the Displaced Persons Act of 1948, P.L. No. 80–774 (62 Stat. 1009). One of the provisions of that statute precluded the issuance of visas to persons who were members of or participants in movements hostile to the United States, such as Nazi and collaborationist organizations. It was the responsibility of the Displaced Persons Commission to identify such organizations and screen out their adherents.

48. Among the organizations found by the Displaced Persons Commission to be hostile collaborationist movements were the Organization of Ukrainian Nationalists, the Bandera group and the Ukrainian Police.

49. Those who were known to have participated in or have been a member of the OUN were ineligible to qualify as displaced persons under the Displaced Person Act of 1948.[15]

50. After receiving certification from the International Refugee Organization, defendant applied to the United States Displaced Persons Commission for designation as a displaced person entitled to admission to the United States under the Displaced Persons Act of 1948, P.L. No. 80–774 (62 Stat. 1009).

51. In interviews with officials of the Displaced Persons Commission defendant was required to provide information regarding his wartime activities. In the course of these interviews defendant misrepresented and/or concealed the following facts relating to his conduct during the war:

   a. defendant stated that he was employed as a tailor's apprentice during the war, concealing his employment with the Ukrainian police;

   b. defendant concealed his membership and/or participation in the OUN and the Bandera group.

   c. defendant stated that he had been "evacuated by order of the German authorities" from the Ukraine to Germany.

52. Defendant's application to the Displaced Persons Commission was acted upon favorably in a Report dated October 27, 1949.

53. On November 18, 1949, defendant filed a visa application with the State Department consulate in Wentorf, Germany. Incorporated into and attached to the visa application was the aforementioned Report of the Displaced Persons Commission. Defendant swore under oath that all information in the visa application and attached Report was truthful.

54. Defendant was issued a Visa on November 29, 1949.

55. On December 17, 1949, defendant and his family entered the United States at New York, New York.

56. On April 25, 1955 defendant filed an Application to File Petition for Naturalization and an accompanying Statement of Facts, together known as Form N–400. During a naturalization examination on July 25, 1955, defendant reviewed the contents of the N–400 with a naturalization examiner and swore that they were true.

57. Defendant's sworn Application (Form N–400) contains the following misrepresentations and concealments:

   a. Defendant represented that the only organization of which he had ever been a member was the Boy Scouts (items 8, 9) concealing his admitted membership in the OUN, Bandera Group and an organization in the United States known as the Organization for the Defense of Four Freedoms for Ukraine, Inc.

---

**15.** William B. Carmody, a case analyst for the Displaced Person Commission from 1948 to 1952, testified that membership in an organization on the inimical list would make the applicant ineligible under the Displaced Person Act. He also testified that those who worked as police during the German occupation were also not eligible. Plaintiff's exhibit 16 which is the inimical list of the Displaced Person Commission, listed the OUN as an inimical organization. Plaintiff's composite exhibit 18 indicates that a number of applicants were rejected by the Displaced Person Commission for their participation in the OUN or the Bandera faction and for being former indigenous police under the German occupation.

b. Defendant claimed he had never committed a crime involving moral turpitude (item 18), concealing his acts of persecution and murder while he was a member of the Ukrainian police.

c. Defendant claimed he had never given false testimony to obtain benefits under the immigration and naturalization laws (item 18), concealing the false testimony given by him to the Displaced Persons Commission and the State Department during the visa application process and to the naturalization examiner at the time of his citizenship application.

58. On July 25, 1955 defendant filed his Petition for Naturalization. In that Petition he falsely swore (item 15) that he was "a person of good moral character."

59. On February 9, 1956, defendant was admitted to citizenship by the Supreme Court of New York, Oneida County, and issued Certificate of Naturalization No. 7115205.

## CONCLUSIONS OF LAW

60. This is an action to denaturalize defendant under Section 340(a) of the Immigration and Naturalization Act, 8 U.S.C. § 1451(a). Under that provision citizenship must be revoked if defendant either:

(a) illegally procured his citizenship, or

(b) procured his citizenship by concealment of a material fact or by willful misrepresentation.

■ 61. To prevail the Government must prove its case by "clear, unequivocal, and convincing" evidence and "not leave the issue in doubt." *Schneiderman v. U.S.*, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943), *Fedorenko v. U.S.*, 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981).

■ 62. Citizenship is illegally procured if "some statutory requirement which is a

condition precedent to naturalization is absent at the time the petition for naturalization was granted," H.R.Rep.No.1086, 87th Cong., 1st Sess. 39, U.S.Code Cong. & Admin.News 1961, pp. 2950, 2983. Lawful admittance under a valid visa pursuant to the Displaced Persons Act of 1948, P.L. No. 80–774 (62 Stat. 1009) was a statutory condition precedent to defendant's legal procurement of citizenship. Section 316 of the Immigration and Nationality Act, 8 U.S.C. § 1427, 1429.[16]

63. Under section 13 of the Displaced Persons Act no visa could be issued to any person who was a "member of, or participated in, any movement hostile to the United States or the form of government of the United States."

■ 64. The defendant's employment in the Ukrainian Police made him a member of and participant in a movement hostile to the United States and was thus ineligible for a visa under Section 13 of the Displaced Persons Act.

65. The defendant's active participation in the Organization of Ukrainian Nationalists (OUN) also made him a member of and a participant in a movement hostile to the United States and was thus ineligible for a visa under Section 13 of the Displaced Persons Act.

66. Section 2(b) of the Displaced Persons Act incorporated within it the eligibility standards of the constitution of the International Refugee Organization (IRO), and limited the issuance of visas to those persons who satisfied these IRO standards.[17]

67. In order to be classified as a refugee or displaced person of concern to the IRO, one had to meet the definitional requirements of refugees and/or displaced persons in Part I, Annex I, of the IRO Constitution and not be excluded by Part II.

---

**16.** Title 8 U.S.C. § 1427(a) provides in pertinent part: "No person . . . shall be naturalized unless such petitioner, (1) immediately preceding the date of filing his petition for naturalization has continuously, after being lawfully admitted for permanent residence . . ."

**17.** Section 2(b) of the Displaced Persons Act provided that: "Displaced person" means any displaced person or refugee as defined in Annex I of the Constitution of the International Refugee Organization and who is the concern of the International Refugee Organization.

68. Section 2(b) of the Displaced Persons Act by incorporating the IRO Constitution provided that visas could not be issued to persons who, during World War II:

(a) assisted the enemy (i.e., Nazi Germany) in persecuting civilians, or

(b) voluntarily assisted the enemy forces (i.e., military forces).

69. By reason of his employment with the Stanislau Kommando of the Ukrainian Police, defendant assisted Nazi Germany in persecuting civilians.

70. By reason of his personal acts of persecution and murder of civilians while employed as a Ukrainian policeman in Lisets, defendant assisted Nazi Germany in persecuting civilians.

71. By reason of his employment with the Ukrainian Police defendant voluntarily assisted the enemy forces of Nazi Germany.

72. By engaging in military actions against Soviet partisans and by training others to fight Soviet partisans defendant voluntarily assisted the enemy forces of Nazi Germany.

73. For each of the independent grounds enumerated in paragraphs 69–72, above, defendant was ineligible for a visa under Section 2(b) of the Displaced Persons Act.

74. Section 10 of the Displaced Persons Act provided, *inter alia*

Any person who shall willfully make a misrepresentation for the purpose of gaining admission in the United States as an eligible displaced person shall thereafter not be admissible in the United States.

75. In his Displaced Person Commission Report, affirmed and sworn to in his Visa application, defendant misrepresented and concealed the material facts enumerated in paragraph 51 a and b of the Findings of Fact.

76. Truthful disclosure by defendant of any one of the aforementioned misrepresented facts would have resulted in outright rejection of defendant's visa application. Section 2(b) of the Displaced Persons Act. Defendant, therefore, was ineligible for a visa under Section 10 of the Displaced Persons Act. *Fedorenko v. United States, supra.*

77. If the defendant had disclosed the true facts during the visa application process, that disclosure would have led to further investigations that might have resulted in the denial of a visa. *United States v. Fedorenko*, 597 F.2d 946 (5th Cir. 1979).

78. Section 316(a) of the Immigration and Nationality Act, 8 U.S.C. § 1427(a) requires as a condition precedent to citizenship that the petitioner be and have been at all relevant times a person of good moral character.[18]

79. Both Mr. Koziy's employment with the Ukrainian police and his participation in acts of persecution and murder of civilians each demonstrate, independently of the other, that he lacked the good moral character required for citizenship.

80. Section 101(f)(6) of the I & N Act, 8 U.S.C. § 1101(f)(6), provides that persons who have given false testimony for the purpose of obtaining benefits under the immigration and nationality laws lack the good moral character required for citizenship.

81. In applying for a visa, defendant gave false testimony as described in paragraphs 51 and 53.

82. In applying for naturalization, defendant gave false testimony as described in paragraphs 56, 57 and 58.

83. By reason of the false testimony given by defendant to obtain benefits

---

**18.** 8 U.S.C. § 1427(a)(3) provides: "(a) No person, except as otherwise provided in this subchapter, shall be naturalized unless such petitioner ... during all the period referred to in this section subsection has been and still is a person of good moral character..."

8 U.S.C. § 1427(e) provides: "In determining whether the petitioner has sustained the burden of establishing good moral character and the other qualifications for citizenship specified in subsection (a) of this section, the court shall not be limited to the petitioner's conduct during the five years preceding the filing of the petition, but may take into consideration as a basis for such determination the petitioner's conduct and acts at any time prior to the period."

under the immigration and nationality laws (i.e., visa and naturalization), defendant lacked the good moral character required for citizenship.

84. Under Section 340(a) of the I & N Act, 8 U.S.C. § 1451(a), concealment or misrepresentation of material facts at the time of naturalization mandates revocation of citizenship when either (1) "facts were suppressed which, if known, would have warranted denial of citizenship, or (2) that their disclosure might have been useful in an investigation possibly leading to the discovery of other facts warranting denial of citizenship." *Chaunt v. United States*, 364 U.S. 350, 355, 81 S.Ct. 147, 150, 5 L.Ed.2d 120 (1966).

85. In his Application to File Petition for Naturalization and his accompanying Statement of Facts, and in his Petition for Naturalization defendant concealed material facts and willfully misrepresented facts.

86. Truthful disclosure by defendant of any one of the misrepresented facts enumerated in paragraphs 57 and 58 would have resulted in the denial of defendant's citizenship application.

87. Truthful disclosure by defendant of any one of the misrepresented facts enumerated in paragraphs 57 and 58, at a minimum, would have resulted in suspension of defendant's citizenship application and an investigation which might have discovered other facts warranting denial of citizenship.

88. Bohdan Koziy was never lawfully admitted into the United States for permanent residence. 8 U.S.C. 1427(a).

(a) As a member of or a participant in movements hostile to the United States, the defendant was ineligible for a visa under Section 13 of the Displaced Persons Act.

(b) Since the defendant assisted Nazi Germany in persecuting civilians and voluntarily assisted the military forces, he was ineligible for a visa under Section 2(b) of the Displaced Persons Act.

(c) The defendant made willful misrepresentations for the purpose of gaining admission into the United States and was thus ineligible for a visa under Section 10 of the Displaced Persons Act.

89. Bohdan Koziy's citizenship was procured illegally.

(a) The defendant was not lawfully admitted into the United States. 8 U.S.C. 1427(a)(1).

(b) The defendant lacked the good moral character required for citizenship. 8 U.S.C. 1427(a)(3).

90. Bohdan Koziy's citizenship must be revoked. 8 U.S.C. 1451(a).

(a) The defendant's citizenship was illegally procured.

(b) The defendant procured his naturalization by concealment and willful misrepresentation of material facts.

## ORDER AND JUDGMENT

This action came on for trial before the Court, and the issues having been duly tried and the Court having issued its Findings of Fact and Conclusions of Law, it is

ORDERED and ADJUDGED:

1. That the Order of February 9, 1956 of the Supreme Court of New York, County of Oneida, admitting the defendant to citizenship is revoked and set aside and Certificate of Naturalization No. 7115205 shall be cancelled.

2. The Clerk of Court shall transmit a copy of this Order and Judgment to the Clerk of the Supreme Court of New York, County of Oneida, who shall cancel the Certificate of Naturalization No. 7115205 pursuant to 8 U.S.C. § 1451(h).

3. The defendant, upon receiving notice of this Order and Judgment, shall surrender and deliver his Certificate of Naturalization to the Attorney General.