**UNITED STATES of America, Plaintiff,**

**v.**

**Kazys PALCIAUSKAS, Defendant.**

**No. 81–547–Civ–T–GC.**

United States District Court,
M.D. Florida,
Tampa Division.

March 23, 1983.

Janet K. DeCosta, Joseph F. Lynch, Dept. of Justice, Washington, D.C., for plaintiff.

Ernest C. Raskaukas, Washington, D.C., James H. Kynes, Tampa, Fla., for defendant.

## MEMORANDUM OF DECISION

ROBERT D. MORGAN, Senior District Judge.[*]

The United States of America brings this action pursuant to the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. § 1451(a) (hereinafter INA), seeking to revoke the defendant's Certificate of Naturalization and thereby cancel the defendant's United States citizenship. The government's six count complaint asserts that the defendant falsified his application for admission into the United States under the Displaced Persons Act of 1948, Pub.L. No. 80–774, ch. 647, 62 Stat. 1009 (1948) (hereinafter DPA).

In Counts I and IV of the complaint the government alleges that the defendant willfully misrepresented his wartime employment in Nazi occupied Lithuania on his Displaced Persons (hereinafter DP) application. Specifically, the government claims that from June 25, 1941 to May, 1942, the defendant was not a "clerk" in a food cooperative in Kaunas, Lithuania, as he represented on his application, but was the Mayor of Kaunas during that time and actively collaborated with the Nazi occupation forces. Count II of the complaint alleges that the defendant assisted the Nazi persecution of the Jewish population of Kaunas, Lithuania and therefore should not have been given DP status which was a prerequisite for naturalization. Count III avers that the defendant participated in a movement hostile to the United States. Finally, Counts V and VI seek the defendant's denaturalization for his lack of good moral character in aiding the Nazi persecution of the Jewish population of Kaunas, Lithuania

[*] Judge Morgan, a Senior Judge of the Central District of Illinois, is sitting by designation.

and in falsifying his DP application. Trial was held by the Court without a jury in this case at Tampa on December 6 through 9, 1982.

■ In order to prevail in a denaturalization proceeding, the government must prove its case by "clear, unequivocal and convincing evidence" and "not leave the issue in doubt." *Schneiderman v. U.S.,* 320 U.S. 118, 135, 63 S.Ct. 1333, 1341, 87 L.Ed. 1796 (1943); *Fedorenko v. U.S.,* 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981). All inferences from the evidence must be drawn in favor of the citizen. *Schneiderman, supra* 320 U.S. at 122, 63 S.Ct. at 1335. Applying this strict standard, from the evidence submitted at trial, and the parties' memoranda, the Court makes these findings and conclusions.

### FINDINGS OF FACT

1. The defendant was born in Zagare, Lithuania in 1907 and from 1939 until August, 1944 lived in Kaunas, Lithuania which at that time was the capital of Lithuania.

2. In June of 1941, the armed forces of Nazi Germany captured Kaunas after driving out the Soviet troops who in 1940 had occupied the previously independent and sovereign nation of Lithuania.

3. Immediately after the withdrawal of the Soviet forces but prior to the actual Nazi occupation, a Lithuanian Provisional government was formed and that government declared an independent Lithuania. Because of his services in the Lithuanian Activist Front, a Lithuanian nationalist group, the defendant was appointed Mayor of Kaunas by the Minister of the Interior of the briefly independent Lithuanian Provisional Government. The defendant was the Mayor of Kaunas from June, 1941 until May, 1942.[1]

This finding is supported by uncontradicted evidence including: (1) A copy of the Minsk Gezeitung, a German language newspaper in White Russia which named the defendant as mayor; (2) A copy of the Kaunas daily newspaper which similarly spoke of the defendant as mayor; (3) Translations of orders from the defendant, signed in his capacity as mayor; (4) Memos from the other government officials to the defendant as mayor; (5) Unequivocal testimony of persons in a position to know and who claimed knowledge.[2]

4. There was no German civilian administration in Kaunas until July 25, 1941. From June 24, 1941 until July 25, Kaunas was governed by the German military who did not pay much attention to the Lithuanian Provisional Government but was instructed "to make use of it." Order No. 15 establishing the Jewish Ghetto in Kaunas was issued on or about July 10, 1941.[3]

1. The defendant was called by the plaintiff to testify at trial but the Court granted the defendant a limited fifth amendment testimonial privilege concerning his activities in wartime Lithuania. The defendant broadly invoked this right and thus neither confirmed nor denied that he was the Mayor of Kaunas.

2. The defendant contends that all documents relating to the defendant's wartime occupation in Lithuania are inadmissible. Specifically, the defendant avers that documents emanating from the Soviet Union or the Yad-Washem Central Archives in Israel cannot be authenticated. All these exhibits were accompanied by certified English translations. Notwithstanding the defendant's allegations, absent some evidence to the contrary, this Court must find that the documents are what they purport to be— i.e. copies of ancient documents found in archives. The Court finds that the certified copies of the documents obtained from Soviet and Israeli possession are authentic under Rule 44 Fed.R.Civ.P. and Rule 902(4), Fed.R.Evid.

3. The defendant vehemently protests the authenticity of Plaintiff's Exhibit A–14, a copy of Order No. 15, dated July 10, 1941, which established the Kaunas Ghetto. The certified copy of Order No. 15 contains markings and crossouts. In addition, although it has a place for the Mayor of Kaunas' signature, no signature is on the document. However, Dr. Raul Helberg, the plaintiff's expert on the holocaust testified that plaintiff's Exhibit A–14 was the final draft of the order and as such the markings on the document are corrections which would have been made before its publication. The Court thus finds that plaintiff's Exhibit A–14 is authentic. However, the exhibit is not evidence that the defendant signed Order No. 15. It is merely one piece of evidence in a great mass of evidence which proves the creation and existence of the Kaunas Ghetto. While he was the

5. On July 25, 1941 a German civil administration was formally established in Lithuania. Brigadefuehrer Kramer was named Stadtskommissar (City Commissioner) of Kaunas. Upon the arrival of the German civil administration, the Lithuanian Provisional Government was theoretically disbanded by the Germans although various government posts, e.g. the mayor's office, were maintained. Some of the leaders of the Lithuanian Provisional Government who might have retained positions under the Nazis resigned upon recognizing that Lithuania was not to be given independence. However, the defendant remained as mayor and was also appointed Counselor/Advisor to Stadtskommissar Kramer. For his service as mayor the defendant was paid a substantial salary by the Nazis in valuable German Marks. The defendant's salary was the second highest category for indigenous employees.

6. Although the Germans retained ultimate control over civilian matters, the indigenous Lithuanian administration performed the bulk of the routine governmental tasks. Specifically, the daily governmental functions, housing, sanitation, police, etc., were administered by the Kaunas city government. The defendant thus exercised considerable power in his position as mayor. However, the defendant was always under the direct control of Stadtskommissar Kramer. In effect, the Nazis gave the orders and outlined the policies which the defendant and his fellow Lithuanian government officials carried out.

7. In early July, 1941, the Germans began a program to place all the Kaunas Jews in a central area or ghetto. The area selected for the ghetto was a very poor and dilapidated suburb of Kaunas—Villijampole. The purported reason for the establishment of the ghetto was the protection of Jews from further violence by the still active Lithuanian partisans.[4] Jewish leaders in Kaunas were notified to prepare the Jewish population for the move. The initial creation of the ghetto was ordered by German military commanders but was unquestionably implemented by the indigenous civilian government of Kaunas including the defendant. It is clear that the Kaunas Municipal Government appropriated all Jewish owned property outside the ghetto, and ordered the ghetto's physical enclosure with barbed wire.

8. Between August and October, 1941, there was a mass execution of ghetto Jews by the Nazis. The defendant knew of the general Nazi policy towards the Jews and he specifically had knowledge of these Autumn executions because he set up a special housing subcommittee which redistributed to other Lithuanians the housing formerly owned by murdered Jews.

9. The internal affairs of the ghetto were administered by a Jewish Council of Elders. The defendant rarely, if ever, dealt directly with the Council of Elders. Most often the Kaunas municipal government was represented in its dealings with the ghetto by Mikas Kaminskas, who reported to the defendant administratively. The defendant did, however, visit the ghetto at least once and from the constant entreaties of the Elders and through the facts related

Mayor of Kaunas, the defendant's participation in the creation and administration of the Ghetto is beyond dispute. Therefore, although there is no proof that the defendant actually signed Order No. 15, there is ample unrefuted evidence that he helped implement its directives.

Authentication of documents under Rule 901 does not mean they are admissible. However, the Court holds that these plaintiff's exhibits are admissible under the hearsay exceptions outlined in Rules 803(6), 803(8) and 803(16) Fed.R.Evid.

The defendant also contests the admissibility of the Lithuanian depositions. However, the defendant's attorney was offered the opportunity to attend the depositions at government expense and he refused. As the videotaped depositions were properly conducted in Lithuania pursuant to Rules 26 and 28(b) Fed.R. Civ.P., the Lithuanian depositions are properly admitted.

4. After the withdrawal of the Soviet forces these armed Lithuanian "partisans" went on an anti-semitic rampage. Several thousand Lithuanian Jews died at their hands. The Nazis did not immediately attempt to stop the slaughter of Jews but gave implicit support for it during the very early days of their occupation.

from other city departments the defendant clearly had some knowledge of horrible living conditions in the ghetto.[5]

10. The defendant resigned from his position of mayor in May, 1942 and immediately obtained a position as the director of "Sodyba", a national food cooperative. This position, like all positions of authority in Nazi occupied Lithuania, was under German auspices. The defendant resigned from his position with "Sodyba" and became the director of another food cooperative in 1943. In August, 1944, the defendant retreated into Germany with the German Army upon advance of the Soviet forces.

11. After the war ended, the defendant was employed in Germany by a labor supply company of the United States Army as its chief accountant and mail clerk.

12. The testimony of Dr. Milton Colvin a member of the Displaced Persons Commission in 1949–50 stationed in Ausberg, Germany, established unequivocally that in order to apply for a United States immigration visa as a displaced person, one first had to obtain certification from the International Refugee Organization (hereinafter IRO), a United Nations Organization, that he was a refugee "of concern" to that organization. The defendant received certification of such status, based on the information that he provided to the IRO. However, on his IRO Resettlement Form, the defendant did not disclose the fact that he had served as Mayor of Kaunas, thereby precluding any determination of ineligibility based upon his possible collaboration with and assistance to the Germans.

13. Based on the certification of eligibility by the IRO, the defendant was eligible to apply to the United States Displaced Persons Commission (hereinafter DP Commission), for a determination of eligibility for a DP visa.

During his processing by the DP Commission, the Counter Intelligence Corps of the United States Army (hereinafter CIC) conducted a mandatory security investigation of the defendant. Because of the inaccessibility of defendant's records in Lithuania, the CIC was unable readily to, and did not, establish the defendant's past history or the reliability of his answers.

The CIC investigation, however, included an interrogation of the defendant and the CIC found no discrepancies between defendant's oral and written application responses. Although the CIC was acutely interested in any suspected acts of collaboration it did not discover that the defendant had ever served as Mayor of Kaunas.

14. If the defendant had revealed his position as Mayor of Kaunas to the CIC, at a minimum the discrepancy between his oral interview and his written information would have been noted by the CIC officer on the CIC report. This would have triggered further investigation into the defendant's activities as mayor. Dr. Colvin also testified that the standard policies of the DP Commission would have considered the mayor of a Nazi occupied town as either an active or passive collaborator. Furthermore, Dr. Colvin noted that the DPA did not distinguish between voluntary and involuntary collaboration. Involuntary acts were only excused if the applicant used his official capacity to secretly aid the anti-Nazi underground. The defendant produced no evidence of underground activities on his part in furtherance of his application. As membership in the underground provided a higher DP category, the defendant had a positive incentive to offer proof of such membership during his DP application. However, proof of underground activity might have uncovered the defendant's position as mayor and, thus, much more information.

15. Once the CIC report was completed, it was included in the defendant's files

5. The ghetto was deliberately and universally overcrowded. Each person received 1.5 square meters of living space. This area did not expand despite the continual depletion of the ghetto's population through disease and execution. Instead, the ghetto's boundaries were constantly redrawn to squeeze the diminishing population into a smaller area. Food supplies to the ghetto were below subsistence and sanitation facilities were minimal.

along with the other documentation completed and/or provided by the defendant. The DP case analyst reviewed the entirety of the defendant's files and found no bar to the status applied for. Ultimately, the DP case analyst concluded that the defendant had met his burden of proof to support his claim to eligibility as a displaced person.

16. The DP case analyst also considered a Personal Data Form, printed in the English and German languages and signed by the defendant on September 6, 1948. Therein the defendant stated that he was employed as an "office clerk" during the Nazi occupation. Defendant responded "no" to a question, which asked whether or not he ever belonged to "any political party or organization". Thus, he did not reveal his activities in the Lithuanian Activist Front.

17. The DP case analyst also reviewed the IRO Resettlement Form, which was signed by the defendant on January 10, 1949. Therein, the defendant stated that he was a "clerk" in the Milk and Meat Ministry and a "manager" of cooperatives between June, 1941 and May, 1942. Thus, the defendant willfully filled in the time period in which he actually served as Mayor of Kaunas and never stated that he served in that capacity at any time.

The DP case analysts were instructed to reject noneligible persons. Misrepresentation was cause for an immediate denial of the petition. In addition, Dr. Colvin posited that knowledge of the defendant's status as mayor of a major city under Nazi occupation would have resulted in the denial of his application for collaboration.

18. Having convinced the DP Commission of his eligibility, defendant next made application for a visa with the United States Department of State, Munich Sub-Consulate in Amberg, Germany. His visa application was executed under oath on March 14, 1949 and it incorporated by reference the defendant's aforementioned DP Report.

Clear and unrefuted testimony showed that standard procedure in processing a DP application included a review of the applicant's (in this case the defendant's) file by the United States Vice Counsel. The file consisted of the visa application, the DP Report, the IRO forms and any other supporting documents. The Vice Counsel then interviewed the applicant. This interview was conducted through an interpreter who spoke a language understood by the applicant. For this purpose, the State Department employed its own separate staff of interpreters; among these interpreters were people who spoke Lithuanian and German.

19. During the applicant interview, the Vice Counsel would have reviewed the file information with the defendant, using the interpreter when necessary. The defendant was required to verify all statements contained in the visa application, the DP Report and on the IRO forms. The defendant would have been questioned about his wartime residence, the date of his entry into Germany and his wartime activities. Only as a result of his continuing misrepresentations and concealments did the defendant succeed in obtaining a DP visa on March 14, 1949. He thereafter entered the United States on April 19, 1949.

20. On July 18, 1949, the defendant filed with the Immigration and Naturalization Service (hereinafter INS) a "Declaration of Intention" to apply for United States citizenship. The defendant swore in the Declaration that he had lawfully entered the United States for permanent residence. He did not reveal or seek to explain the misrepresentations and concealments he had made before officials of the IRO, the DP Commission and the United States Consulate.

21. On August 2, 1954, the defendant filed with the INS an "Application to File Petition for Naturalization" and a "Statement of Facts for Preparation of Petition (together comprising Form N–400).

On Form N–400 the defendant swore that at no time had he given false testimony to obtain benefits under the immigration and naturalization laws. He thus continued to conceal his misrepresentations to the IRO, DP Commission and State Department regarding his position as Mayor of Kaunas.

22. On or about August 11, 1954, the defendant appeared for a naturalization examination, the purpose of which was to review and swear to the contents of his N–400 form. Following an interview with a naturalization examiner, the defendant swore to the truthfulness of the statements on the application.

The naturalization examiner also reviewed the defendant's visa and his DP Report. The defendant offered no further statements concerning his wartime activities and, thus, the naturalization examination of defendant revealed no grounds for rejection.

23. Defendant's formal Petition for Naturalization (Form N–405) was prepared from information contained on Form N–400. A naturalization examiner again interviewed the defendant and the defendant was again placed under oath. The examiner then reviewed the defendant's petition for naturalization and the defendant was asked whether or not everything stated in the petition was true. The defendant responded affirmatively and signed the N–405 in the presence of the examiner.

24. As it appears unnecessary to resolution of this proceeding, the Court makes no specific findings relative to possible active participation by the defendant in acts of persecution of Jews.

## CONCLUSIONS OF LAW

1. Under section 340(a) of the INA, 8 U.S.C. § 1451(a), citizenship must be revoked if the defendant either: (a) illegally procured his citizenship; or, (b) procured his citizenship by concealment of a material fact or by willful misrepresentation. As noted at the outset of this memorandum, the heavy burden of proof to obtain denaturalization has been recognized by the Supreme Court, *inter alia*, in *Scheiderman* and *Fedorenko supra.*

2. Lawful admittance under a valid visa pursuant to the Displaced Persons Act of 1948, Pub.L. No. 80–774 (62 Stat. 1009) was a statutory condition precedent to defendant's legal procurement of citizenship. Specifically, Section 316(a) of the INA, 8 U.S.C. § 1427(a), provides:

No person ... shall be naturalized unless such petitioner, (1) immediately preceding the date of filing his petition for naturalization has resided continuously, *after being lawfully admitted* for permanent residence ... (Emphasis added).

*See also Fedorenko v. U.S.,* 449 U.S. 490, 514–15, 101 S.Ct. 737, 751–52, 66 L.Ed.2d 686.

3. Section 2(b) of the DPA incorporated within it the eligibility standards of the constitution of the International Refugee Organization (IRO), and limited the issuance of visas to those persons who met the IRO standards.

4. Section 10 of the DPA provided:

Any person who shall willfully make a misrepresentation for the purpose of gaining admission in the United States as an eligible displaced person shall thereafter not be admissible in the United States.

In his DP application, affirmed and sworn to in his visa application, the defendant willfully concealed the fact that he was the Mayor of Nazi occupied Kaunas and misrepresented that he was a "clerk" during that period of time. This omission and misrepresentation were material and would have affected the action on his visa application. Therefore, because of his misrepresentations the defendant was ineligible for a visa under Section 10 of the DPA. *See Fedorenko v. U.S. supra* at 515, 101 S.Ct. at 751.

5. Section 316(a)(3) of the INA, 8 U.S.C. § 1427(a)(3) requires as a condition precedent to citizenship that the petitioner be and have been at all relevant times a person of good moral character. Section 316(e) of the INA, 8 U.S.C. § 1427(e) provides:

In determining whether the petitioner has sustained the burden of establishing good moral character and the other qualifications for citizenship ..., the Court shall not be limited to the petitioner's conduct during the five years preceding the filing of the petition, but may take

into consideration ... the petitioner's conduct and acts at any time prior to that period.

Section 101(f)(6) of the INA, 8 U.S.C. § 1101(f)(6), provides that persons who have given false testimony for the purpose of obtaining benefits under the immigration and nationality laws lack the good moral character required for citizenship.

6. When applying for naturalization the defendant testified falsely as to his wartime occupation in Kaunas in order to obtain benefits under the immigration laws. Thus, the defendant lacked the good moral character required for citizenship. Therefore, the defendant's citizenship must be revoked for violation of Section 316(a) of the INA.

7. Section 340(a) of the INA, 8 U.S.C. § 1451(a) provides that concealment or misrepresentation of material facts at the time of naturalization mandates revocation of citizenship if: (1) facts were suppressed which, if known, would have warranted denial of citizenship, or (2) that their disclosure might have been useful in an investigation possibly leading to the discovery of other facts warranting denial of citizenship.

8. The defendant's truthful disclosure of his wartime occupation would have at a minimum led to further investigation which could have provided the grounds for a denial of the defendant's citizenship. Thus, the defendant's naturalization must be revoked.

9. (a) Defendant's asserted affirmative defenses lack merit in law;

(b) All exhibits received subject to objections stated at the trial were admissible and are received in evidence;

(c) All video tapes and transcripts of depositions received in evidence subject to objections stated at the trial were admissible for the purpose and to the extent offered and are so received in evidence.

10. In sum, after reviewing the evidence the Court concludes that the defendant was never lawfully granted United States citizenship.

The defendant's citizenship having been illegally procured and procured by concealment of a material fact and willful misrepresentation, the Court must now revoke it. *Fedorenko, supra.*

## FINAL JUDGMENT

For the reasons stated in this Court's Memorandum of Decision which is filed simultaneously with this Order, the Court enters this Final Judgment. Accordingly, it is ORDERED:

1. That the Certificate of Naturalization No. 7400934 issued by the United States District Court for the Northern District of Illinois to KAZYS PALCIAUSKAS is hereby revoked and set aside; and from the date of this Order the defendant is forever restrained and denied the rights and privileges of United States citizenship.

2. That the defendant, KAZYS PALCIAUSKAS, shall promptly deliver his Certificate of Naturalization No. 7400934 to the Attorney General or his representative, the United States Attorney for the Middle District of Florida.

3. That the Clerk of the Court shall send certified copies of the Memorandum of Decision and Final Judgment in this case to the Attorney General of the United States and the United States District Court for the Northern District of Illinois, as well as to counsel for the parties. The Clerk of Court for the United States District Court for the Northern District of Illinois shall then cancel Certificate of Naturalization No. 7400934 in compliance with 8 U.S.C. § 1451(h).