**Edgars LAIPENIEKS, Petitioner,**

v.

**IMMIGRATION AND NATURALIZA-
TION SERVICE, Respondent.**

No. 83–7711.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 8, 1984.

Decided Jan. 9, 1985.

Jan I. Goldsmith, Dorazio, Barnhorst, Goldsmith & Bonar, San Diego, Cal., for petitioner.

Bruce J. Einhorn, Dept. of Justice, Washington, D.C., for respondent.

Before TANG, BOOCHEVER and BEEZER, Circuit Judges.*

TANG, Circuit Judge:

Edgars Laipenieks petitions from a Board of Immigrations Appeals ("BIA" or the "Board") decision finding him deportable under section 241(a)(19) of the Immigration and Nationality Act ("INA") [8 U.S.C. § 1251(a)(19)]. The BIA found Laipenieks deportable on the ground that he participated in or assisted the Nazi government in the persecution of Communists because of their political opinion.

Laipenieks argues that the Immigration and Naturalization Service ("INS" or the "government") failed to prove deportability on the basis of Section 1251(a)(19) by clear, convincing and unequivocal evidence. We

* Judge Walter Ely was a member of the panel that originally heard oral argument in this case. He had concurred in the proposed majority opinion before his death but had not had an opportunity to consider the proposed dissenting opinion. Judge Robert R. Beezer was chosen by lot to replace Judge Ely on the panel and has had the benefit of listening to the tapes of the oral argument, as well as reading the briefs and reviewing the record in his consideration of this case.

agree with Laipenieks and reverse the decision of the BIA.

## I

### FACTS

Edgars Laipenieks was born in 1913 in Latvia which at the time was part of the Russian empire. During World War I, Latvia became an independent state. The Communist party was officially abolished and it was a crime to be a member. In June 1940, the Soviets invaded Latvia, deporting thousands of Latvian citizens to Siberia and killing numerous others. In June 1941, Nazi forces entered Latvia and occupied the region until 1944.

In July 1941, Laipenieks joined the Latvian Political Police ("LPP"), an organization formed to investigate and arrest individuals who had participated in the atrocities during the Soviet occupation. A historical expert testified at the deportation hearing that the LPP collaborated with the Nazis to apprehend Communists and other suspected Soviet sympathizers. Laipenieks admitted to working with suspected Soviet criminals at LPP central headquarters and at the Riga Central Prison.

In 1944, Laipenieks fled from Latvia to avoid the impending Russian invasion. Laipenieks moved to Chile in 1947 and worked there until 1960 as a professor of physical education and track coach. He also became a Chilean citizen. In 1960, he obtained a visa to the United States which enabled him to come to the United States and accept a position as Professor of Physical Education at the University of Denver.

On June 1, 1981, the Office of Special Investigations initiated deportation proceedings against Laipenieks, alleging that: (1) Laipenieks willfully misrepresented facts on his 1960 visa application making him ineligible for a visa and, therefore, deportable under Sections 212(a)(19) [8 U.S.C. § 1182(a)(19)] and 241(a)(1) [8 U.S.C. § 1251(a)(1)] of the INA and; (2) during World War II, Laipenieks assisted in the persecution of persons on the basis of political opinion, rendering him deportable under Section 241(a)(19) of the INA [8 U.S.C. § 1251(a)(19)].

The deportation hearing was held during the period January 26, 1982 through February 18, 1982. Following the hearing, the Immigration Judge ("IJ") terminated the proceedings on the basis that the government had failed to establish grounds for deportation under either Sections 1251(a)(1) or 1251(a)(19). The government appealed the IJ's decision to the BIA. On September 8, 1983, the BIA reversed the IJ's decision and ordered Laipenieks deported on the basis of its finding that Laipenieks had participated or assisted in the persecution of communists during World War II because of their political opinion.

## II

### DISCUSSION

A. *Standard of Review.*

 We first note that in a deportation case, the INS has the burden of proving its case by clear, convincing and unequivocal evidence which does not leave the issue in doubt. *Fedorenko v. United States,* 449 U.S. 490, 505, 101 S.Ct. 737, 746, 66 L.Ed.2d 686 (1981). *See also United States v. Kowalchuk,* No. 83–1571, slip op. at 9 (3d Cir. Sept. 11, 1984). On review, we must consider whether there is reasonable, substantial and probative evidence in the record, when considered as a whole, to support a finding that each material fact has been established by clear, convincing and unequivocal evidence. *Espinoza-Ojeda v. INS,* 419 F.2d 183, 186 (9th Cir.1969). The standard is to be applied equally stringently regardless of the difficulty which the Government may encounter when relying on events from the distant past. *Woodby v. INS,* 385 U.S. 276, 286 n. 19, 87 S.Ct. 483, 488 n. 19, 17 L.Ed.2d 362 (1966).

 The standard of review is not altered when an agency decision runs contrary to the findings of the hearing examiner. *See NLRB v. Warren L. Rose Castings, Inc.,* 587 F.2d 1005, 1008 (9th Cir. 1978). However, this court has observed that in a situation where the hearing examiner and the Agency have reached opposite

results, the appellate court's reviewing eye may be more searching:

> [E]ven when there is independent, credited evidence of the Board's decision, a reviewing court will scrutinize the Board's findings of fact more critically if they contradict the ALJ's factual conclusions than if they are in accord with the ALJ's findings.

*Loomis Courier Service, Inc. v. NLRB,* 595 F.2d 491, 496 (9th Cir.1979). *See also Penasquitos Village, Inc. v. NLRB,* 565 F.2d 1074, 1079 (9th Cir.1977) ("the special deference deservedly afforded the administrative law judge's factual determinations based on testimonial inferences will weigh heavily in our review of a contrary finding by the Board").

**B.** *The Merits.*

1. The applicable statutory provision.

Laipenieks was found deportable under 8 U.S.C. § 1251(a)(19) which provides for the deportation of any alien who:

> during the period beginning on March 23, 1933, and ending on May 8, 1945, under the direction of, or in association with—
>
> (A) the Nazi government of Germany,
>
> (B) any government in any area occupied by the military forces of the Nazi government of Germany,
>
> (C) any government established with the assistance or cooperation of the Nazi government of Germany, or
>
> (D) any government which was an ally of the Nazi government of Germany,
>
> ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion.

Section 1251(a)(19) was enacted on October 13, 1978, as a Congressional response to a perceived loophole in United States Immigration Law. The first immigration legislation that directed itself to persons who had been involved in persecution of individuals is contained in certain provisions of the Displaced Persons Act of 1948 ("DPA"), 62 Stat. 1009 *et seq.* The DPA was enacted for the broad purpose of providing entrance visas to this country for peoples displaced by the ravages of World War II. However, that legislation contained express provisions rendering certain individuals ineligible for Displaced Person Status. Among those excluded by the DPA were individuals who had "assisted the enemy in persecuting civil[ians]...." *See Fedorenko v. United States,* 449 U.S. 490, 495 n. 4, 101 S.Ct. 737, 741 n. 5, 66 L.Ed.2d 686 (1981).

Section 10 of the DPA, 62 Stat. 1013, placed the burden of proving eligibility for displaced person status on the applicant seeking admission and provided that "[a]ny person who shall willfully make a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person shall thereafter not be admissible into the United States".

The government has succeeded in litigation seeking deportation of several individuals who were admitted to this country under the DPA. *See, e.g. Fedorenko,* 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686; *United States v. Koziy,* 540 F.Supp. 25 (S.D.Fla.1982), *aff'd,* 728 F.2d 1314 (11th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 130, 83 L.Ed.2d 70 (1984); *United States v. Linnas,* 527 F.Supp. 426 (E.D.N.Y.1981), *aff'd,* 685 F.2d 427 (2nd Cir.), *cert. denied,* 459 U.S. 883, 103 S.Ct. 179, 74 L.Ed.2d 146 (1982); *United States v. Osidach,* 513 F.Supp. 51 (E.D.Pa.1981). The general ground for deportation is that the individuals willfully misrepresented facts relating to persecutorial acts and therefore entered the country in violation of Section 10. *See Fedorenko,* 449 U.S. at 514–15, 101 S.Ct. at 751–52.

Section 1251(a)(19) was passed by Congress in recognition that individuals who had not entered this country pursuant to the DPA or the similar provisions of the Refugee Relief Act of 1953 and who had assisted Nazi Germany in persecutorial acts were not subject to deportation. *See* House Report No. 95–1452 at 3, *reprinted in* 1978 U.S.Code Cong. & Ad.News 4700, 4702. The clear intent of the Section 1251(a)(19) amendment was to allow deportation of individuals who had ordered, incit-

ed, assisted or participated in persecutorial acts under the Nazi regime. *Id.*

There is one important difference between the DPA and the Section 1251(a)(19) amendment. In addition to Section 2, Section 13 of the DPA makes ineligible for Displaced Person Status individuals who are or have "been a member of, or participated in, any movement which is or has been hostile to the United States". 62 Stat. 1014. In *Osidach*, the court interpreted Section 13 of the DPA as precluding Displaced Person Status for "mere willing membership—without proof of personal participation in acts of persecution—in a movement that persecuted civilians". 513 F.Supp. at 72.

██ We note that no provision parallel to Section 13 of the DPA exists in the Section 1251(a)(19) legislation. Thus, to the extent that DPA cases such as *Osidach* rely on Section 13 as a ground for deportability, we find them inapposite to the case at bar. It is clear from the plain language of Section 1251(a)(19), that more than willing membership in a movement is required to establish deportability.

The DPA cases that interpret Section 2 of the DPA are helpful, however, in interpreting the Section 1251(a)(19) amendment. In *Fedorenko*, the Supreme Court rejected the Court of Appeals' finding that Section 2 of the DPA was only intended to exclude individuals from displaced person status who had voluntarily assisted in the persecution of civilians. 449 U.S. at 511, 101 S.Ct. at 749. *Fedorenko* stated that the proper analysis under the statute was whether the acts of the individual amounted to assisting in the persecution of civilians:

> [A]n individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village and who admitted to shooting at escaping inmates

on orders from the commandant of the camp, fits within the statutory language about persons who assisted in the persecution of civilians. Other cases may present more difficult line-drawing problems but we need decide only this case.

*Id.* at 512–13, n. 34, 101 S.Ct. at 750, n. 34.

In *Osidach*, 513 F.Supp. at 70, the court read the above language as requiring that in order to establish "participation" or "assistance", the act of participation must involve "some personal activity involving persecution".

██ Similar to Section 2 of the DPA, aliens subject to deportation under Section 1251(a)(19) are those individuals who "ordered, incited, assisted or otherwise participated in the persecution of any person ..." We find that the language and intent of Section 1251(a)(19) requires that deportability may only be sustained when the evidence establishes that the individual in question personally ordered, incited, assisted or otherwise participated in the persecution of individuals.

This interpretation is mandated first by the plain language of Section 1251(a)(19). The statutory provision clearly states that deportability is established when the "*alien*" has been found to have ordered, incited, assisted or otherwise participated in persecutorial acts. Mere acquiescence or membership in an organization is insufficient to trigger the deportability provision of Section 1251(a)(19).

██ Second, the intent of the legislation demonstrates that active personal involvement in persecutorial acts needs to be demonstrated before deportability may be established. The following dialogue between Representative Holtzman, a cosponsor of the legislation, and Representative Seiberling occurred during the House debate:

> Ms. HOLTZMAN. . . . [T]he bill is intended to cover active participation and not mere acquiescence by the population as a whole ...
> Mr. SEIBERLING. Would membership in the Nazi party, standing by itself, constitute active participation?

**1432**

Ms. HOLTZMAN. No. 124 Cong.Rec. 31649 (1978).

In sum, guided by *Fedorenko,* the language of the statute, and the legislative intent, we find that Section 1251(a)(19) requires in the instant case, that the government provide proof of personal active assistance or participation in persecutorial acts before deportability may be established. *See also Kowalchuk,* slip op. at 16–22.

2. The evidence.

The deportation hearing in the present case was held during the period of January 26, 1982 through February 18, 1982. Twelve witnesses testified to support the government's claim that Laipenieks had participated or assisted in persecutorial acts. However, only three of the witnesses actually testified at the deportation hearing. The nine other witnesses testified by video taped oral deposition conducted in Riga, Latvia in the Soviet Union. Both the IJ and the BIA's findings contain extensive discussions of the witnesses' testimony. We also find it necessary to examine the testimony to determine if the evidence introduced is sufficient to support deportability.

a. *The deposition witnesses' testimony.*

Nine of the government witnesses testified through deposition testimony taken in the Soviet Union: Edgars Andreivich Rode, Janis Edvardovich Engelis, Carlis Smekerstans, Nikolays Aleksandrs Endelis, Karlis Augustovitch Zvirgzds, Vladimar Alexandrovich Striguns, Janis Otto Ignats, Juris Ansis Beikmanis and Edgars Christianovich Salminsh.

While admitting the deposition testimony of the government witnesses, the IJ was greatly troubled by the procedures through which the depositions were procured. First, the IJ noted that in the pre-hearing statements of three of the deposition witnesses, the presiding Soviet officer referred to the matter as the "case of the Nazi war criminal Laipenieks". The IJ also observed that during the actual taking of the depositions, the Soviet Procurator, in the presence of the witnesses, continually referred to the matter as the "war criminal case" or the "Nazi criminal Laipenieks case". The IJ found that the prejudicial and highly suggestive language used by the Soviet official tainted the deposition proceedings.

The IJ also found that the Soviet officer frequently and sharply curtailed defense counsel's opportunity to cross-examine the deposition witnesses. The IJ determined that the cross-examination restrictions placed on Laipenieks' counsel limited the opportunity to expose faults in the memory and perception of the Soviet witnesses and to highlight the intimidating atmosphere in which the witnesses were deposed. In light of the prejudicial statements made by the Soviet Procurator and the limitations placed on cross-examination of the Soviet government witnesses, the IJ felt it necessary to discount the deposition testimony.

Other courts have been skeptical of the trustworthiness of similar deposition testimony. For example, in *United States v. Kungys,* 571 F.Supp. 1104 (D.N.J.1983), *appeal docketed,* No. 83–5884 (3rd Cir. Dec. 7, 1983), much of the government's case against the defendant involved deposition testimony obtained in the Soviet Union. The district court found that the depositions were taken under such circumstances as to undermine seriously their credibility. *Id.* at 1123. In its comprehensive discussion of the problems involved with such testimony, the court first noted that the prosecution of the case resulted from "an unusual cooperative effort of the Office of Special Investigations and Soviet authorities". *Id.* The court next spoke to the difficulties of Soviet involvement:

The Soviet authorities are outside of the jurisdiction of the United States judicial system. Consequently it is impossible to provide the usual safeguards of trustworthiness of the evidence having its source in the Soviet Union. This becomes a matter of concern for two reasons. First, the Soviet authorities have a strong motive to ensure that the government succeeds in this case. Second the

Soviet criminal and judicial system is structured to tailor evidence and produce results which will further the important political ends of the Soviet state at the expense, if need be, of justice in a particular case.

*Id.*

The motive the court alluded to in the above passage is the desire of the current Soviet government to discredit emigres who fled Eastern Europe in the face of the impending Soviet advancement towards the end of the Second World War. *Id.*

As a result of procedural irregularities similar to those evinced in the instant case, the *Kungys* court refused to consider the deposition testimony as evidence that the defendant committed acts of persecution. *Id.* at 1132.

■ In the instant appeal, we are again faced with a cooperative effort among the Office of Special Investigations and the Soviet authorities. We agree with the IJ that Soviet involvement in the procurement of the deposition testimony seriously undermined its trustworthiness. Therefore, we find that the IJ properly discounted the deposition testimony in his fact finding determinations.

In spite of the trustworthiness problems with the deposition testimony, the IJ did review the videotapes. He found them of little probative value. First, the IJ noted that only two of the deponents, Engelis and Zvirgzds, claimed that Laipenieks had physically assaulted them. Engelis, however, was unable to recognize Laipenieks from a photographic display as the individual who had beaten him. In addition, Engelis recalled that the person he remembered as Laipenieks had entered another room to have a smoke. Yet the IJ observed that the record revealed that at that time Laipenieks was an Olympic class athlete and did not smoke.

Zvirgzds identified three different individuals from an eight-person photo display as Laipenieks. The IJ found Zvirgzds' testimony that Laipenieks had beaten a fellow prisoner impeached by an inconsistent 1976 statement made to a Soviet official in which he could not recall the individual who had instigated the beating.

The IJ found the seven other deponents similarly lacking in credibility. The IJ observed that the seventy-three year old Rode's memory was faulty. Smerkerstans, too, had a faulty memory. The IJ noted that the deposition demonstrated that Smerkerstans was occasionally unresponsive, had difficulty hearing, had lost his eyesight and had damaged nerves. The IJ found Endelis' testimony probative only to the extent of placing Laipenieks at the central prison in 1941. The depositions of Striguns and Salminsh did help establish that Laipenieks worked for the LPP. However, neither Striguns nor Salminsh claimed that Laipenieks had engaged in persecutorial acts during his tenure with the LPP. Ignats also linked Laipenieks to the prison but did not suggest that Laipenieks had engaged in persecutorial acts. Finally, Beikmanis' testimony was found by the IJ to be scattered, imprecise and discredited.

The IJ noted that only two of the nine deponents, Rode and Smekerstans, whose memories were noticeably faulty, were able to identify positively Laipenieks from the eight-person photo spread. In addition, the IJ found of little value several of the deponents' testimony that fellow prisoners had communicated to them that Laipenieks had mistreated them. He noted the forty year span since the conversations had occurred and the obvious hearsay problems inherent in such testimony.

b. *The hearing witnesses' testimony.*

The IJ also carefully analyzed the hearing testimony of the government witnesses to determine if they established that Laipenieks had assisted or participated in persecutorial acts. Only three of the hearing witnesses testified about persecutorial acts allegedly engaged in by Laipenieks; Arnold Berzins, Edward Virsis and Ber Maister.

Berzins and Virsis testified at the hearing that Laipenieks had beaten them. Berzins recalled that the person he knew as

Laipenieks was dressed in a jacket with black boots and knee length pants. Not one of the other eleven government witnesses who asserted that they had seen Laipenieks at the central headquarters or prison described Laipenieks as similarly attired. The IJ observed that Laipenieks' brother, Miervaldis Laipenieks, was also employed at the prison. Noting the strikingly different descriptions in dress between Berzins' testimony and the other witnesses, the IJ found that Berzins was most likely confusing the two brothers.

Virsis' testimony was found to be even less convincing. His account at the hearing of his beating was at sharp odds with a 1947 statement he made to the French police. For instance, in his 1947 statement, Virsis asserted that Laipenieks was a Deputy Chief of the German Gestapo. At the hearing, he modified his story and testified that Laipenieks was a member of the LPP.

Finally, the IJ found Maister's testimony lacking in credibility. First, he noted that several pre-hearing statements made by Maister in relation to the alleged beating were at significant variance with his hearing testimony. In addition, while Maister identified Laipenieks at the hearing, the IJ observed that on two separate occasions in 1974 and 1975 Maister had been unable to identify Laipenieks from a photo spread.

### c. Laipenieks' testimony.

Finally, the IJ reviewed the testimony of Laipenieks. He noted that Laipenieks admitted to striking inmates occasionally at the police headquarters or at the central prison. However, the IJ found nothing in the record to establish that these acts were undertaken against individuals because of their political beliefs. Rather, the IJ found that the mistreatment that the witnesses suffered could "be traced to the claim that they had betrayed Latvia during the repressive Soviet occupation between 1940 and 1941", rather than because of their political opinion.

The IJ noted that there may have been good reason for Latvian authorities to suspect each of the prisoner witnesses of previous illegal activity. Engelis was a Deputy Chief of an Executive Committee under the Russians and was genuinely suspected of preparing a list of Latvians who were to be deported to Siberia. Berzins also was charged with preparing a list of Latvians who were to be deported to Siberia. Zvirgzds and Virsis were thought to be Russian sympathizers at the time of their imprisonment. Rode had been a high ranking official during the Soviet occupation. Smekerstans was accused of assisting the Soviets in liquidating private property during the occupation. Endelis was suspected of being a Soviet sympathizer and activist. Striguns had been a member of the Soviet army. Ignats had cooperated with Soviet officials in their attempt to stave off defeat at the hands of the Germans. Beikmanis was a member of the local militia, organized to supplement the Soviet Army and was suspected of being a Soviet activist. Of the persons allegedly beaten, there appeared to be no legitimate suspicion of anti-Latvian activity only as to Levitanus.[1] And Levitanus was apparently assaulted because of his two sons' reputed persecutorial behavior during the Soviet rule and not because of his political beliefs.

Finally, the IJ noted that Laipenieks' testimony was largely credible. The IJ concluded that in light of the procedural irregularities and potential for prejudice of the deposition testimony, the low probative value and lack of trustworthiness of both the deposition testimony and the "eyewitness" trial testimony, and the largely credible testimony of Laipenieks, that the government failed to establish that Laipenieks had assisted or participated in persecution of individuals because of their political opinion.

### 3. The BIA Decision.

■ The BIA disagreed with the IJ, finding that the government had estab-

---

1. Ber Maister, while admitting that he was never mistreated by Laipenieks, testified through deposition that a person he remembered as Laipenieks had participated in a beating of one Levitanus, a fellow prisoner. Alexandrovich Striguns, the remaining government "eyewitness", worked with Laipenieks at LPP headquarters.

lished that Laipenieks assisted or participated in persecution of individuals because of political opinion. The BIA did concede that the "mass murder and forceable deportation of Latvian citizens which apparently took place under the Soviet occupation were clearly criminal in nature, and the efforts by [Laipenieks] and the LPP to locate, arrest, and punish those responsible for such crimes constitute prosecution for criminal conduct, not political persecution." However, the BIA found that Laipenieks and the LPP's activities extended beyond legitimate investigation of suspected Communist criminals to apprehension of all Communists in general. The BIA found that this imprisonment of individuals merely because they were Communists constituted persecution because of political opinion.

The BIA noted that several of the government witnesses asserted that they were imprisoned for no apparent reason other than their political beliefs. The BIA observed that Virsis claimed he was imprisoned for being "pro-Soviet." The BIA suggested that Rode's innocuous position as an athletics inspector on a Soviet sports committee could not support a legitimate belief that Rode had engaged in violent acts against Latvians during the Soviet occupation. The BIA also noted several witnesses' testimony that other individuals had been imprisoned for being Soviet sympathizers. The BIA found that Zvirgzds was jailed for being a member of a local Soviet agricultural committee. The BIA accepted Beikmanis' and Endelis' testimony that they were incarcerated for being Communist "activists."

The BIA concluded that based on Laipenieks' and the eyewitnesses' testimony, "the LPP assisted and participated in the persecution of persons not only because of criminal conduct but because of their communist political opinions, sympathies, or activities stemming therefrom which were not of a criminal nature".

We find the BIA's analysis and conclusion faulty in several respects. First, we note that the BIA's conclusion that the "*LPP* assisted and participated in the persecution" of individuals misstates the re-

quirements for deportability. In order to establish deportability under Section 1251(a)(19), the *individual* must be found to have participated or assisted the *organization* in persecutorial acts. Thus, the expert testimony as to the acts of the LPP is only helpful to the extent it establishes that the organization may have been involved in acts of persecution because of political beliefs. The government must also prove by clear, convincing and unequivocal evidence that Laipenieks persecuted individuals because of political opinion or at least that Laipenieks' acts led to the persecution of individuals because of political belief.

The BIA accepted the government witnesses' testimony that they were incarcerated at Riga Central Prison merely because they were Soviet sympathizers and activists. We find problems with the BIA's tacit acceptance of the government witnesses' testimony and the Board's ultimate conclusion that these individuals were jailed because of their political opinion.

As stated above, we agree with the IJ that procedural irregularities in the taking of the deposition testimony seriously undermine the trustworthiness of the statements made. The BIA noted the problems with the deposition testimony and stated that it would rely on the testimony only to establish the type of persons incarcerated at the central prison and also that testimony which was not contradicted by Laipenieks. Yet the Board clearly relied on the deposition testimony to help formulate its conclusion that individuals were imprisoned at the complex merely because of political beliefs.

We find that the procedural irregularities caused by the Soviet participation in the procurement of the deposition testimony cast the reliability of such testimony into doubt. This is especially true here where the deponents' admitted participation in anti-Latvian atrocities during the Soviet occupation would have amounted to statements against the deponents' own interests. It was clearly incumbent upon the deposition witnesses and the Soviet authori-

ties to portray the deponents as Communist "innocents" who had been imprisoned merely because of their political beliefs.

In addition, we note that the difficulties that the IJ had with the credibility and trustworthiness of the deponents and trial witnesses also extended to their claims of imprisonment merely because they were Soviet sympathizers. The BIA chose to ignore the IJ's credibility determinations of the government witnesses and accepted the witnesses' assertions that they were incarcerated for no legitimate reason.

A further difficulty we have with the Board's analysis is its conclusion that incarceration of individuals who were Soviet sympathizers and activists amounts to persecution because of political opinion. Even if we were to accept the government witnesses' testimony as entirely credible, we would find it problematic to hold that the government established through their testimony that Laipenieks assisted or participated in persecutorial acts. The BIA concluded that investigation and incarceration of individuals who were merely Soviet activists or sympathizers amounted to persecution. Yet it is unclear from the record what being a Soviet activist or sympathizer might entail. We note that a Soviet "activist" or "sympathizer" could refer to anything from an individual who merely was in agreement with Communist ideology to a person who was endeavoring behind the scenes to reinstall the departed Soviet regime in Latvia. The government did little to establish that the witnesses in the present case more closely resemble the former than the latter. And we reiterate that it is the government that must establish by clear, convincing and unequivocal evidence that Laipenieks assisted or participated in the persecution of individuals because of political opinion.

We also find it important to place the terms Soviet "sympathizer" and "activist" in the context in which they must be interpreted. During Laipenieks' service with the LPP, Latvia was a war-torn nation. Only months before, the country had suffered terrible atrocities at the hands of Soviet rule. Latvia was at war with Russia and had reason to fear spies, saboteurs and

pro-Soviet conspirators working to undermine the government in power. Thus, Laipenieks and the LPP certainly had reason to concern itself with the behavior of Soviet "activists" and "sympathizers".

The BIA relied heavily on Laipenieks' admission that he investigated all kinds of Communists. We question whether this statement adds much to the government's case. First, we note that Laipenieks qualified his statement by explaining that the investigations and interrogations were specifically structured to separate those who had participated in Soviet atrocities or were legitimately suspected of working in collusion with Soviet officials from those who were merely ideologically opposed to German rule. Additionally, the questioning of suspected Communists about acts during the Soviet occupation was to be expected in light of the state of affairs in Latvia when the investigations occurred. Suspected Communists were the most likely of the Latvian citizenry to have been involved or have had knowledge concerning who was responsible for acts committed during the Soviet occupation. The fact that Laipenieks admitted to investigating all Communists, by itself, does not establish that as a result of these investigations individuals were persecuted because of political opinion.

An important distinction between the alleged persecution in the present case and circumstances involving individuals who participated or assisted in the persecution of individuals on the basis of religion, race or national origin must also be considered. When individuals are singled out and victimized on the basis of religion, race or national origin there is no legitimate reason for doing so. For instance, there was no rational basis for the persecution perpetrated against the Jews during the Holocaust. There can be only one explanation for the persecutorial acts; the Jews were persecuted because they were Jews. In contrast, the present case is much more troublesome. Laipenieks and the LPP had a legitimate basis for investigating Communists. The Communists remaining in Latvia were sympathetic to a hostile nation who was

presently at war with the Latvians and who only a few months earlier had exterminated thousands of Latvian citizens. In light of the potentially legitimate basis for investigating "Communists" at the time in question, we believe it incumbent on the government to establish clearly and convincingly that individuals were persecuted solely because of their political opinion.

Another fact relied on by the BIA to establish deportability is Laipenieks' admission that he occasionally struck prisoners. While we certainly do not condone the treatment that prisoners apparently received at the central prison, we do not find Laipenieks' admission sufficient to support deportability. Perhaps the treatment that the prisoners received at the hands of Laipenieks might correctly be interpreted as "persecution" under Section 1251(a)(19). Even if this were the case, the government has failed to show that this persecution occurred *because of the prisoner's political beliefs*. It is this element of the statutory provision that remains unfulfilled by the government's evidence.

The Board also suggests that Laipenieks' position in the LPP amounted to assisting or participating in the persecution of individuals because of political opinion. The Board concluded that Laipenieks' work as an investigator of "all kinds of communists" turned up individuals who were eventually persecuted by the LPP. The BIA apparently assumed that included in the investigations conducted by Laipenieks were individuals who were persecuted solely because of their political opinion. However, the record contains no evidence that any individual apprehended by Laipenieks was eventually persecuted because of the person's political beliefs. Without proof of at least one instance in which Laipenieks' investigations resulted in the ultimate persecution of an individual because of his political beliefs, we are unable to infer that such occurred.

We stress the limited nature of our holding. It is not intended to suggest that Section 1251(a)(19) precludes deportation on the grounds that an alien assisted or participated in persecution of individuals because of their political opinion. The decision today rests only on the conclusion that the government's evidence failed to establish deportability in the present case.

## III.

### CONCLUSION

In sum, we find insufficient evidence to support the BIA's determination that the government established by clear, convincing and unequivocal evidence that Laipenieks assisted or participated in the persecution of persons because of their political beliefs. We therefore GRANT the petition for review and REVERSE the BIA decision.

BOOCHEVER, Circuit Judge, dissenting:

I respectfully dissent from the court's conclusion that there was insufficient evidence to support the BIA's determination that the government met its burden of proof in this case. In my view, the majority did not accord the exhaustive, scholarly BIA opinion, decided by a unanimous five member board, the deference it deserved under this circuit's prior decisions on the standard of review of administrative decisions.

### I. Standard of Review

As the majority correctly states, in reviewing the BIA deportation decision, we must consider whether there is reasonable, substantial, and probative evidence in the record, when considered as a whole, to support a finding that each material fact has been established by clear, convincing, and unequivocal evidence. *Woodby v. INS*, 385 U.S. 276, 281–83, 87 S.Ct. 483, 485–87, 17 L.Ed.2d 362 (1966). When the Board disagrees with the administrative law judge, the reviewing court may look harder at the Board's findings of fact than if they were in accord with the officer's findings. *Loomis Courier Serv. v. NLRB*, 595 F.2d 491, 496 (9th Cir.1979); *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1078 (9th Cir.1977). However, such disagreement does not alter the basic standard of review. *NLRB v. Tischler*, 615 F.2d 509, 511 (9th Cir.1980); *NLRB v. Warren L.*

*Rose Castings, Inc.*, 587. F.2d 1005, 1008 (9th Cir.1978).

Having said this, the majority proceeds to alter the standard, incorrectly treating the Immigration Judge's (IJ's) findings with deference, and according none at all to the BIA's decision. The proper method of review is to treat the IJ's findings as part of the whole record on appeal. *Penasquitos*, 565 F.2d at 1078, *quoting Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496, 71 S.Ct. 456, 468, 95 L.Ed. 456 (1951). Weight may be given to the IJ's determinations of credibility, because those are inferences he or she draws from observation of the witnesses' demeanor. *Penasquitos*, at 1078. However, the IJ's determinations of credibility are not conclusive on the Board, and no special deference is given to the derivative inferences the IJ draws from the findings of fact. *Id.* at 1079. The basic standard of review remains unchanged by the disagreement between the judge and the Board: if the judge and the Board interpret the evidence differently, we cannot choose freely between the two interpretations. So long as the Board's decision is supported by substantial evidence, Congress has mandated that we defer to the Board and affirm. 8 U.S.C. § 1105a(a) (1982);[1] *Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 464, *Tischler*, 615 F.2d at 511.

## II. The Statute

As stated in the BIA opinion, section 241(a)(19) of the Immigration and Nationality Act contains four requirements for deportability:

(1) "under the direction of, or in association with—the Nazi government of Germany, [or] any government in any area occupied by the military forces of the Nazi government of Germany," the respondent (2) "assisted or otherwise participated in" (3) "the persecution of any person" (4) "because of . . . political opinion."

The majority concedes that Laipenieks worked under the direction of the Nazi government. It does not seriously question that that government participated in the persecution of communists because of their political beliefs. The majority, however, questions the finding that Laipenieks individually assisted or otherwise participated in the persecution of any person because of political beliefs.

Regardless of the unpopularity of communism in our society, the persecution of a person because of communist beliefs is proscribed by the statute. There was ample convincing evidence that Laipenieks participated and assisted in the persecution of individuals because they were communists.

## III. The Evidence

### A. *The Eyewitnesses*

The IJ and the majority discounted the testimony of all the witnesses except Laipenieks himself. As to the nine witnesses whose testimony was videotaped in the Soviet Union, the IJ found insufficient guarantees of trustworthiness. The Soviet hearing officer on occasion used prejudicial language, and limited the defense's cross-examination. From these facts, the IJ drew the inference, which the majority endorses, that the testimony was untrustworthy. The BIA, in contrast, held the testimony useful despite these problems at least to establish certain facts, such as the type and treatment of prisoners at the central prison. If this credibility determination were drawn from demeanor evidence, the IJ's interpretation would deserve special weight. The determination, however, was based not on demeanor but on facts

---

**1.** (a) The procedure prescribed by, and all the provisions of Chapter 158 of Title 28, shall apply to, and be the sole and exclusive procedure for, the judicial review of all final orders of deportation heretofore or hereafter made against aliens within the United States pursuant to administrative proceedings under section 1252(b) of this title or comparable provisions of any prior Act, except that—

. . . .

(4) except as provided in clause (B) of paragraph (5) of this subsection, the petition shall be determined solely upon the administrative record upon which the deportation order is based and the Attorney General's findings of fact, if supported by reasonable, substantial, and probative evidence on the record considered as a whole, shall be conclusive; . . .

8 U.S.C. § 1105a(a) (1982).

about the Soviet procedures as well known to the BIA as to the IJ. Thus, we should defer to the BIA's finding that the deposition testimony credibly showed that people were imprisoned solely on the basis of communist beliefs, unless the shortcomings were so egregious that we can say as a matter of law that the depositions should be disregarded entirely.

Obviously it is difficult to find witnesses of events which occurred over forty years ago, at a location now under Soviet control. That the depositions were taken in Soviet-occupied Latvia may be reason for caution in evaluating the testimony. In this case, however, the manner of conducting these depositions does not warrant their exclusion. Under these circumstances, it was for the BIA to evaluate the credibility of the witnesses and the extent upon which their testimony could be relied.

Specifically, the BIA found that the following facts were established by the eye-witnesses' testimony and proved that individuals were persecuted by the LPP under the direction of the Nazi EK–2:

Edwards Virsis was imprisoned for over one year at RCP because he was suspected of being "pro-Soviet." Edgars Rode was an athletics inspector on a government sports committee during the Soviet occupation of Latvia. There is no suggestion whatsoever that, as an athletics inspector, Rode was in any way involved in inflicting harm or violence on Latvians. Yet, he was imprisoned for approximately one and one-half years. Rode also testified that his fellow prisoners at RCP were held because they were Soviet sympathizers. Prisoner Carlis Smekerstans was released from RCP to work near a concentration camp upon the condition that he have nothing to do with communists, Jews, or any political activities. Nikolays Endelis was imprisoned at RCP and Salaspils concentration camp for approximately three years because he had been an "activist" and a "Stakhanovist"—working at his bicycle factory to simplify and improve their production methods. Again, there is no indication that these activities were in any way criminal. He also testified that among

the prisoners at RCP were Komsomol members [persons who provided Latvian youngsters with training, indoctrination, and socialization to become model Soviet-communist citizens—which activities clearly do not rise to the level of criminal conduct]. Karlis Zvirgzds also was imprisoned at RCP and Salaspils concentration camp for three years. He had been a rural farmer and head of the local agricultural committee. He was arrested as a suspected Communist Party member and Soviet sympathizer, and was interrogated by the LPP as to whether he was a communist or Komsomol member. Juris Beikmanis was a Latvian farmer and communist activist who was a prisoner at RCP for several months. He testified that his fellow prisoners were held because they were communist activist [sic], giving as one example a prisoner who had been a local Party organizer. RCP prisoner Janis Otto Ignats testified that his fellow prisoners were political offenders, including Communist Party members, Komsomol members, Young Communist League members, communist activists and trade union members, as well as former Red Guards and militiamen. He defined "activists" as those involved with sports or cultural work.

The BIA also found that the testimony established that LPP interrogation techniques frequently included beatings with fists, blackjacks, or truncheons. Laipenieks admitted that during interrogation of prisoners he sometimes beat them with his hand to "help" the prisoners "to talk".

Communist activity could lead not only to imprisonment at the Riga Central Prison, but also to execution, or to transfer to a concentration camp. One of the eyewitnesses, a Soviet sympathizer forced by a Nazi death threat to work as a Gestapo-LPP informer, testified that the role of the LPP was to liquidate "the Communist Party and all other groups that were against the German Order."

To impeach the witnesses the IJ and the majority rely heavily on the various wit-

nesses' inability to pick out Laipenieks' picture from a photo spread. The BIA did not draw as great an inference of untrustworthiness from this failure as did the IJ. Rather than discounting all of the witnesses' testimony, the BIA chose not to rely on the testimony as to identification of Laipenieks, but to accept testimony by those witnesses on other relevant issues.[2]

Even if we were to ignore the standard of review and chose freely between the IJ's and the Board's inferences from the failure to identify, the Board's position is the better one of the two. The inability of the witnesses to recognize a photo of someone last seen forty years previously does not seriously impeach their other testimony. This is particularly true because Laipenieks' prominence as an athlete made him easy to identify at the time of the relevant acts. Moreover, because this is not demeanor evidence, the standard of deference to the BIA requires us to accept its inferences rather than the IJ's. Thus, these witnesses' testimony is also competent to establish that people were imprisoned solely on the basis of communist beliefs.

### B. The Expert Testimony

The majority's reversal of the BIA stems, in large part, from the majority's virtual disregard of the expert evidence, which was not disputed, and on which the BIA relied heavily. The government's expert witness, Dr. Paul Hilberg, Ph.D, is a noted author and historian of the Nazi era, and has been accepted as an expert historical witness in numerous other cases.[3] Additionally, the record before the BIA included copies of several captured Nazi docu-

ments relevant to the EK–2 and the LPP. In its lengthy opinion, the majority disposes of the expert testimony in two sentences, stating:

> Thus, the expert testimony as to the acts of the LPP is only helpful to the extent it establishes that the organization may have been involved in acts of persecution because of political beliefs. The government must also prove by clear, convincing and unequivocal evidence that Laipenieks persecuted individuals because of political opinion or at least that Laipenieks' acts led to the persecution of individuals because of political belief.

This facile dismissal ignores the fact that the expert testimony went far toward proving that Laipenieks did indeed assist in the persecution of individuals because of political beliefs. The expert testified, and the BIA found, that the LPP was intimately connected with and established under the German *Einsatzkommando* 2 (EK–2), a division of the German police force whose primary purpose was to carry out the Nazi policy of eliminating communists and Jews in occupied countries. Because the EK–2 did not have enough German manpower to carry out its goals, the Germans deemed it "necessary that additional security formations be established expeditiously from the ethnic groups of the conquered territories which are acceptable to us, as has already been done to some extent by the *Einsatzgruppen* of the Security Police." Directive from Reichsfuehrer Himmler (July 25, 1941) (Exh. G–34 to BIA opinion). The LPP was formed to fill this need in Latvia,

**2.** The BIA opinion states:
However, in the summaries [of the evidence] which follow, we do not find it necessary to rely on this disputed testimony. Rather, the testimony of these witnesses—all but two of whom were prisoners at RCP—generally will be used only insofar as it illustrates the type of persons who were incarcerated at RCP and what happened to them, or is otherwise not inconsistent with the respondent's testimony.

**3.** As the BIA noted,
Dr. Hilberg is the author of *The Destruction of the European Jews,* Exhibit G–27, a scholarly, highly-regarded compendium of his decades

of research into the holocaust. He is a doctor of Public Law and Government, McCullough Professor of Political Science at the University of Vermont, a noted author, and a presidentially-appointed member of the United States Holocaust Memorial Council. He has been accepted as an expert historical witness in the following cases: *United States v. Osidach,* 513 F.Supp. 51 (E.D.Pa.1981); *United States v. Linnas,* 527 F.Supp. 426 (E.D.N.Y.1981), *aff'd,* 685 F.2d 427 (2d Cir.1982), *rehearing denied,* April 5, 1982; *United States v. Kosiy,* 540 F.Supp. 25 (S.D.Fla.1982); *United States v. Palciauskas,* 559 F.Supp. 1294 (M.D.Fla.1983).

and was organized in a parallel fashion to the German police units.

The BIA noted that "[t]he paramount principle in organization of the [LPP] was that they were fully under the control of, subordinate to, and received orders from, the Nazi police authorities." The LPP was the implementing force of the EK–2. LPP officials took orders directly from the Nazi police, and their salaries were paid out of the EK–2 budget. The purpose of the LPP's formation was "above all to eliminate those elements who tried to hide their communist beliefs." The LPP had no mission independent of this Nazi goal. After investigating, arresting, and interrogating suspected communists, often by means of physical brutality, LPP officers such as Laipenieks, by his own admission, would turn the files over to the EK–2 with a recommendation about each prisoner's fate. Thus expert testimony clearly and convincingly established that the LPP, and Laipenieks as an LPP officer, persecuted individuals because of political belief.

The majority, in its statement of facts, characterizes the LPP as "an organization formed to investigate and arrest individuals who had participated in the atrocities during the Soviet occupation." This statement is in direct disagreement with both the expert testimony and the BIA's findings, as summarized above, as to the formation and purpose of the LPP. Once again, the majority fails to follow this circuit's standard of review in refusing deference to the BIA. In this instance, it cannot be contended that the IJ's opinion has extra weight, since there was in the record no dispute as to the expert's credibility.

### C. Laipenieks' Testimony

Laipenieks himself stated that he worked for the LPP investigating "all kinds of communists," and that the role of the LPP was to pursue communists in Latvia. He attempts to excuse his participation in this persecution by suggesting that his motive was to pursue communist traitors to Latvia who had aided the Soviets in their invasion. That the Nazi's goal in forming the LPP was to exterminate all communists he characterizes as a coincidence. However, the

BIA rejected this argument, properly holding under *Fedorenko v. United States*, 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981), that the word "assisted" in § 1251(a)(19) does not carry with it any element of intent. In *Fedorenko*, construing a provision of the Displaced Persons Act of 1948, Pub.L. No. 774, 62 Stat. 1009, 1013, similar to § 1251(a)(19), *see Fedorenko*, 449 U.S. at 495 nn. 3–4, 101 S.Ct. at 741 nn. 3–4, the Court found that the omission of the word "voluntarily" from the provision "compel[led] the conclusion that the statute made *all* who assisted in the persecution of civilians ineligible for visas." *Id.* at 512, 101 S.Ct. at 750. Thus Laipenieks' personal motives for joining the LPP are irrelevant to the application of § 1251(a)(19). Moreover, the BIA found that although Laipenieks naturally preferred to focus his testimony on his prosecution of communists who had participated in Soviet atrocities, he admitted that he personally investigated all kinds of communists, and acknowledged that some were imprisoned solely on grounds of political beliefs.

The evidence showed that the Germans established the LPP to eradicate all communists in Latvia, because of their political beliefs, and that the LPP implemented that policy. Laipenieks volunteered to work for the LPP, and in doing so assisted in the German plan of persecution. Moreover, he was not a clerk or a janitor. He was an investigator, an interrogator, and the author of recommendations as to the fate of the prisoners.

The majority, however, states that "[w]ithout proof of at least one instance in which Laipenieks' investigations resulted in the ultimate persecution of an individual because of his political beliefs, we are unable to infer that such occurred." With all due respect, I believe that in looking for one tree, the majority has lost sight of the forest. Laipenieks joined and worked for a Nazi-run police force whose sole purpose was to pursue communists *qua* communists. Everything he did while working for the LPP was in furtherance of the Nazi goal of eliminating communists.

## CONCLUSION

The government in this case was required to prove by clear, convincing, and unequivocal evidence that section 1251(a)(19) applied to Laipenieks. The BIA found that the government had met its burden of proof, and we should defer to the BIA's decision if there is reasonable, substantial, and probative evidence to support it. On the record, the government presented such evidence.